Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL INSURANCE
COMPANY and GEICO CASUALTY CO.,                                   Docket No.:

                                      Plaintiffs,

          -against-                                              **Plaintiff Demands a Trial by**
                                                                 **Jury**
RAHUL SOOD, D.O., SOOD MEDICAL PRACTICE, LLC,
MID-STATE ANESTHESIA CONSULTANTS LLC, SACHIN
SHAH, M.D., SUMEET ARORA, D.O., and ROY LIU, M.D.,

                                      Defendants.
-------------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $1,300,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

non-reimbursable healthcare services, including purported examinations, drug screens, and pain

management injections (collectively the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds").

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $16,700,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Sood Medical Practice, LLC and Mid-State Anesthesia Consultants LLC, because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others;

(v)     Sood Medical Practice, LLC failed to meet applicable New York licensing requirements necessary to provide the Fraudulent Services in New York;

(vi)    Sood Medical Practice, LLC and Mid-State Anesthesia Consultants LLC were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey; and

(vii)   the Fraudulent Services, to the extent that they were provided in New Jersey, were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

3.     The Defendants fall into the following categories:

(i)     Defendants Sood Medical Practice, LLC ("Sood Medical") and Mid-State Anesthesia Consultants LLC ("Mid-State Anesthesia") (collectively the "Provider Defendants") are closely-related New Jersey corporate entities through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

2

    (ii)     Defendant Rahul Sood, D.O. ("Sood") is a physician licensed to practice medicine in New York and New Jersey, purported to own Sood Medical and Mid-State Anesthesia, and purported to perform many of the Fraudulent Services on behalf of Sood Medical and Mid-State Anesthesia.

    (iii)    Defendants Sachin Shah, M.D. ("Shah"), Sumeet Arora, D.O. ("Arora"), and Roy Liu, M.D. ("Liu") are physicians licensed to practice in New York and New Jersey and purported to perform many of the Fraudulent Services on behalf of Sood Medical and Mid-State Anesthesia.

4.     As discussed herein, the Defendants at all relevant times have known that:

    (i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

    (ii)    in many cases, the Fraudulent Services never were provided in the first instance;

    (iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

    (iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others;

    (v)    Sood Medical failed to meet applicable New York licensing requirements necessary to provide the Fraudulent Services in New York; and

    (vi)    Sood Medical and Mid-State Anesthesia were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

5.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Provider Defendants.

6.     The charts annexed hereto as Exhibits "1" – "2" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7.      The Defendants' fraudulent scheme began as early as 2015 and has continued uninterrupted since that time.

8.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,300,000.00.

## THE PARTIES

**I.    Plaintiffs**

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

**II.   Defendants**

10.     Defendant Sood resides in and is a citizen of New York. Sood was licensed to practice medicine in New Jersey on June 17, 2009, and in New York on August 6, 2009, purported to own Sood Medical and Mid-State Anesthesia, and purported to perform many of the Fraudulent Services on behalf of Sood Medical and Mid-State Anesthesia.

11.     Defendant Sachin Shah, M.D. ("Shah") resides in and is a citizen of New Jersey. Shah was licensed to practice medicine in New Jersey on October 29, 2013, and in New York on October 21, 2011, and purported to perform many of the Fraudulent Services on behalf of Sood Medical and Mid-State Anesthesia.

12.     Defendant Sumeet Arora, D.O. ("Arora") resides in and is a citizen of New Jersey. Arora was licensed to practice medicine in New Jersey on May 30, 2017, and in New York on May 16, 2016, and purported to perform many of the Fraudulent Services on behalf of Sood Medical and Mid-State Anesthesia.

4

13.     Defendant Roy Liu, M.D. ("Liu") resides in and is a citizen of New Jersey. Liu was licensed to practice medicine in New Jersey on March 21, 2019, and in New York on January 30, 2017, and purported to perform many of the Fraudulent Services on behalf of Sood Medical and Mid-State Anesthesia.

14.     Defendant Sood Medical is a New Jersey limited liability company with its principal place of business in New Jersey. Sood Medical was formed in New Jersey on February 17, 2015 as Interventional Pain Consultants of North Jersey LLC ("IPCNJ"). On November 30, 2017, the company's name was formally changed to Sood Medical Practice, LLC. Sood Medical was registered as a foreign limited liability company in New York on February 22, 2018. Sood Medical is purportedly owned by Sood and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

15.     Defendant Mid-State Anesthesia is a New Jersey limited liability company with its principal place of business in New Jersey. Mid-State Anesthesia was formed in New Jersey on February 17, 2016. Mid-State Anesthesia is purportedly owned, in part, by Sood and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

20.     For example, and as set forth herein, Defendants submitted or caused to be submitted a substantial amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

21.     Moreover, and as set forth herein, Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

22.     Furthermore, and as set forth herein, Defendants regularly committed tortious acts in New York, thereby causing GEICO to incur substantial damages.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     GEICO underwrites automobile insurance in New York and New Jersey.

### I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

#### A.    Pertinent New York Law Governing No-Fault Insurance Reimbursement

24.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

25.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance ("Personal Injury Protection" or "PIP") benefits ("PIP Benefits") to Insureds.

26.    In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

27.    In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

28.    In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

29.    In the alternative, in New York a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

30.    Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

32.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

33.     New York law prohibits licensed healthcare services providers, including physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

34.     What is more, with limited exceptions that are not applicable here, New York law prohibits licensed healthcare services providers, including physicians, from referring patients for electrodiagnostic testing to healthcare practices in which they have an ownership interest, whether or not the healthcare services providers disclose their ownership interest to the patient. See New York Public Health Law § 238-a.

35.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

36.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

37.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP

Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

38.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

39.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

40.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

41.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.    Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

42.    Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

43.    As in New York, under the New Jersey no-fault insurance laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA-1500 form.

44.    In order for a healthcare services provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all significant laws and regulations governing healthcare practice in New Jersey.

45.    Thus, a healthcare services provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary.

46.    Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement in New Jersey, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

47.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers in New Jersey that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

48.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits in New Jersey for healthcare services that are not rendered in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

49.     Pursuant to N.J.A.C. 13:35-6.17, physicians in New Jersey are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

50.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. …

(Emphasis added).

51.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

52.     Therefore, physicians and medical practices that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

53.     In New Jersey, physicians generally may not refer patients to a healthcare practice in which they have a significant beneficial interest. Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides that:

A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in

combination with the practitioner's immediate family has a significant beneficial interest . . . .

54. Pursuant to N.J.S.A. 45:9-22.4:

"Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

55. Pursuant to N.J.S.A. 45:9-22-5(c)(1), the Codey Law's restrictions on patient

referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

56. Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient

referrals also do not apply to:

ambulatory surgery or procedures involving the use of any anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)     the practitioner who provided the referral personally performs the procedure;

(b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

> (c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and
>
> (d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

57.     Physicians and medical practices in New Jersey which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

58.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits in New Jersey for reasonable, necessary, and appropriate treatment. At the same time, a healthcare services provider in New Jersey is only eligible to receive PIP Benefits for medically necessary services.

59.     Pursuant to N.J.S.A. 39:6A-2(m):

> "Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:
>
> (1)     is not primarily for the convenience of the injured person or provider,
>
> (2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and
>
> (3)     does not involve unnecessary diagnostic testing.

60.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

61.     When a healthcare services provider submits a claim for PIP Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the

specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

62.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

63.     A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

64.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

14

65.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

66.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

## II.     The Defendants' Fraudulent Scheme

67.     Beginning in 2015, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A.     The Multidisciplinary Clinics and Kickbacks

68.     Sood and Sood Medical did not advertise or market Sood Medical's services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.

69.     Instead, Sood Medical operated on an itinerant basis from a large number of multidisciplinary clinics located throughout the New York metropolitan area (the "Clinics") that purported to provide treatment to patients with no-fault insurance, including but not limited to Clinics at the following locations:

(i)      1 Bridge Street, Ardsley, New York;

(ii)     1 Civic Center Plaza, Poughkeepsie, New York;

(iii)    20 Cherry Tree Farm Road, Middletown, New Jersey

(iv)    2184 Flatbush Avenue, Brooklyn, New York

(v)     2363 Ralph Avenue, Brooklyn, New York

(vi)    2625 Atlantic Avenue, Brooklyn, New York

(vii)    293 East 53rd Street, Brooklyn, New York

(viii)   4131 Richmond Avenue, Staten Island, New York

(ix)     44 Lincoln Highway, Edison, New Jersey

(x)      520 Bergen Avenue, Jersey City, New Jersey

70.      Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

71.      With the exception of the clinic located at 1 Bridge Street, Ardsley, New York (the "Bridge Street Clinic"), Sood and Sood Medical gained access to the Clinics by paying kickbacks to other healthcare services providers (the "Referring Providers") who operated from the Clinics and controlled access to the Clinics.

72.      With respect to the Bridge Street Clinic, Sood and Sood Medical own and control the clinic, and control the healthcare providers operating there, and the medical services purportedly provided to Insureds at the clinic.

73.      The kickbacks to the Clinics were disguised as ostensibly legitimate fees to "lease" space or personnel at the Clinics. In fact, these were "pay-to-play" arrangements that caused the Referring Providers at the Clinics to provide access to Insureds and to refer the Insureds to the Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

74.      In keeping with the fact that the "rent" that Sood and Sood Medical paid to the Referring Providers constituted kickbacks in exchange for patient referrals, the purported "rent" was far in excess of the fair market value of the putative leaseholds.

75.      In further keeping with the fact that the "rent" Sood and Sood Medical paid to the Referring Providers constituted kickbacks in exchange for patient referrals, at an Examination

under Oath, Sood was unable to state the amount of "rent" he paid at any Clinic and was subsequently unable to provide copies of any leases with any Clinics.

76.     In exchange for these kickbacks from Sood and Sood Medical, the Referring Providers automatically referred Insureds to the Defendants for the medically unnecessary Fraudulent Services, regardless of the Insureds' individual circumstances or presentation.

**B.     The Defendants' Fraudulent Treatment and Billing Protocol**

77.     Virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

78.     Even so, the Defendants purported to subject virtually every Insured in the claims identified in Exhibits "1" - "2" to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the billing that they could submit through Sood Medical and Mid-State Anesthesia to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

79.     The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms, presentation, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

80.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent

step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

81.     No legitimate physician or other licensed healthcare provider or professional entity would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

82.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Charges for Initial Examinations at Sood Medical**

83.     Upon receiving an illegal referral from the Referring Providers at the Clinics, Sood Medical purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

84.     The initial examinations were performed as a "gateway" in order to provide Insureds with phony, predetermined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise non-reimbursable drug screens, pain management injections, and follow-up examinations.

85.     The initial examinations were typically performed by Sood, Liu, Arora, or Shah, on behalf of Sood Medical.

86.     As set forth in Exhibit "1", the initial examinations were then typically billed to GEICO through Sood Medical under CPT codes 99245, 99244, 99205, or 99204, or 99203, typically resulting in a charge of $700.00 for each purported examination.

87.     The charges for the initial examinations were fraudulent in that they misrepresented Sood Medical's eligibility to collect No-Fault Benefits in the first instance and because they were medically unnecessary and were performed – to the extent that they were performed at all –

pursuant to illegal referrals from the Referring Providers at the Clinics, not to treat or otherwise benefit the Insureds.

88.     Further, the Defendants also were not in compliance with relevant laws governing healthcare practice in New York and New Jersey, and were not eligible to collect No-Fault Benefits in connection with any of the claims identified in Exhibit "1" inasmuch as Sood and Sood Medical gained access to Insureds at the Clinics by paying kickbacks to individuals who own and/or control the No-Fault Clinics, in violation of the No-Fault Laws.

89.     The charges for the initial examinations were also fraudulent in that they misrepresented the severity of the Insureds' presenting problems and the nature and extent of the examinations.

90.     According to the NY Fee Schedule, the use of CPT code 99205 typically requires that the Insured present with problems of high severity.

91.     Similarly, the use of CPT codes 99245, 99244, or 99204 typically requires that the Insured present with problems of moderate-to-high severity.

92.     Though the Defendants billed many of the purported initial examinations under CPT codes 99245, 99244, 99205, and 99204, the Insureds almost never presented with problems of moderate-to-high severity, much less high severity. By contrast, to the extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

93.     Even so, the Defendants routinely billed for the initial examinations under CPT codes 99245, 99244, 99205, and 99204, and thereby falsely represented that the Insureds presented with problems of moderate-to-high severity or high severity.

94.     The Defendants routinely falsely represented that the Insureds presented with problems of moderate-to-high or high severity in order to create a false basis for their charges for the examinations under CPT codes 99245, 99244, 99205, and 99204, because examinations billable under those codes are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

95.     The Defendants also routinely falsely represented that the Insureds presented with problems of moderate-to-high or high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including drug screens and pain management injections.

96.     The Defendants also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity or high severity in order to create a false basis for the referrals for continued medically unnecessary chiropractic, physical therapy, and acupuncture services, pursuant to the illegal "pay-to-play" arrangements that caused the owners/operators of the Clinics to provide the Defendants with access to Insureds.

97.     Furthermore, the Defendants' charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the examinations.

98.     The Defendants misrepresented and exaggerated the amount of face-to-face time that the examining physician spent with the Insureds or the Insureds' families.

99.     The use of CPT code 99245 to bill for an examination typically requires that a physician spend 80 minutes of face-to-face time with the Insured or the Insured's family during the examination.

100.    Similarly, the use of CPT code 99244 or 99205 to bill for an examination typically requires that a physician spend 60 minutes of face-to-face time with the Insured or the Insured's family during the examination.

101.    Additionally, the use of CPT code 99204 to bill for an examination typically requires that that a physician spend 45 minutes of face-to-face time with the Insured or the Insured's family during the examination.

102.    Although the Defendants billed for their putative examinations under CPT codes 99245, 99244, 99205 and 99204, neither Sood, Liu, Arora, Shah, nor any healthcare practitioner associated with Sood Medical ever spent 45 minutes, much less 60 or 80 minutes, on an initial examination. To the extent that the initial examinations were actually conducted, they lasted a fraction of the time represented by the billing.

103.    In addition, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99245 or 99205, or caused them to be submitted, they falsely represented that Sood, Liu, Arora, Shah, or another healthcare practitioner associated with Sood Medical: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity."

104.    Similarly, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99245 or 99204, or caused them to be submitted, they falsely represented that Sood, Liu, Arora, Shah, or another healthcare practitioner associated with Sood Medical: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

105.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires that the physician take: (i) an extended history of the present illness; (ii) a history of all body systems, not

only the body systems that are related to the patient's present complaint; and (iii) a complete past, family, and social history from the patient.

106.     When the Defendants billed for the initial examinations under CPT codes 99245, 99244, 99205, or 99204, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to evaluate during the examinations.

107.     In fact, with respect to the claims for initial examinations under CPT codes 99245, 99244, 99205, or 99204 that are identified in Exhibit "1", neither Sood, Liu, Arora, Shah, nor any healthcare practitioner associated with the Sood Medical ever recorded a "comprehensive" patient history.

108.     For instance, in each of the claims under CPT code 99245, 99244, 99205, or 99204 identified in Exhibit "1", neither Sood, Liu, Arora, Shah, nor any healthcare practitioner associated with Sood Medical ever recorded a history of all of the Insured's body systems.

109.     Rather, after purporting to provide the initial examinations, the Defendants simply prepared reports containing phony or boilerplate patient histories that were designed solely to support the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including urine drug testing and pain management services, and referrals for medically unnecessary chiropractic, physical therapy, and acupuncture services.

110.     In all of the claims for initial examinations under CPT codes 99245, 99244, 99205, or 99204 that are identified in Exhibit "1", the Defendants falsely represented that they had taken a "comprehensive" patient history, when in fact they had not taken a "comprehensive" patient history, because virtually all of the consultation reports contain only a brief and cursory discussion of the Insureds' patient histories.

111.    In the claims for initial examinations under CPT codes 99245, 99244, 99205, or 99204, the Defendants falsely represented that the initial examinations included a "comprehensive" patient history in order to provide a false basis to bill for the initial examinations under CPT codes 99245, 99244, 99205, or 99204, because those codes reimbursable at a higher rate than examinations that do not require a "comprehensive" patient history.

112.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

113.    Pursuant to the CPT Assistant, in the context of patient examinations and examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

114.    The CPT Assistant recognizes the following organ systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

> > > (xii)   endocrine;
> > >
> > > (xiii)   hematologic/lymphatic; and
> > >
> > > (xiv)   allergic/immunologic.

115.   Pursuant to the CPT Assistant, in the context of patient examinations and examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

> > > (i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;
> > >
> > > (ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;
> > >
> > > (iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);
> > >
> > > (iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;
> > >
> > > (v)   examination of gait and station;
> > >
> > > (vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;
> > >
> > > (vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;
> > >
> > > (viii)   coordination, deep tendon reflexes, and sensation; and
> > >
> > > (ix)   mental status, including orientation to time, place and person, as well as mood and affect.

116.   In fact, with respect to the claims for initial examinations under CPT codes 99245, 99244, 99205, or 99204 that are identified in Exhibit "1", neither Sood, Liu, Arora, Shah, nor any

healthcare practitioner associated with Sood Medical ever conducted or recorded a "comprehensive" physical examination.

117.   With respect to the claims for initial examinations under CPT codes 99245, 99244, 99205, or 99204 that are identified in Exhibit "1", neither Sood, Liu, Arora, Shah, nor any healthcare practitioner associated with Sood Medical ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

118.   For instance, in each of the claims under CPT codes 99245, 99244, 99205, or 99204 identified in Exhibit "1", neither Sood, Liu, Arora, Shah, nor any healthcare practitioner associated with Sood Medical ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

119.   Furthermore, although the Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "1", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)  examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper

extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

120.    In keeping with the fact that the initial examinations purportedly provided by the Defendants did not satisfy the requirements of examinations billed using CPT codes 99245, 99244, 99205, or 99204, the cursory initial consultation reports submitted by the Defendants were three to four pages in length and routinely failed to record even the most basic requirements of a "comprehensive" physical examination.

121.    What is more, and in further keeping with the fact that the Defendants did not conduct any "comprehensive" physical examinations, the examination reported contained verbatim language that was copied-and-pasted across numerous reports for numerous different Insureds.

122.    For example, numerous examination reports contained the following language:

"I am recommending that the patient commence/continue with a rehabilitation program, three times a week for four weeks, to facilitate maximal benefit in conjunction with interventional pain management. This program is recommend to address function limits, decrease pain, increase range of motion, increase strengthening [sic] and correct biomechanics of the spine. By achieving pain reduction, this program is directed to decrease muscle spasm, increase range of motions, facilitate and train weak muscles, accelerate the healing process thereby restoring normal patterns of muscle function, increase capacity to function and perform ADL's and work tasks. The patient's treatment should include acupuncture, therapeutic activities and exercises, neuromuscular re-education etc. I believe that a combination of proposed pain management protocols / medications / intervention and a course of physical therapy / rehabilitation including but not limited to

26

acupuncture is medically necessary and will significantly impact and facilitate this patients [sic] recovery."

123.    In the claims identified in Exhibit "1", when the Defendants billed for the initial examinations under CPT codes 99245, 99244, 99205, or 99204, they falsely represented that they performed "comprehensive" patient examinations on the Insureds during the initial examinations.

124.    In fact, the Defendants had not provided comprehensive physical examinations because they had not documented findings with respect to at least eight of the Insureds' organ systems, nor had they documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

125.    The Defendants falsely represented that the initial examinations included "comprehensive" physical examinations in order to provide a false basis to bill for the initial examinations under CPT codes 99245, 99244, 99205, or 99204, because those CPT codes are reimbursable at a higher rate than examinations that do not require "comprehensive" physical examinations.

126.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

127.    Although the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" when billing under CPT codes 99245 or 99205 and "moderate complexity" when billing under CPT codes 99244 or 99204, in actuality the examinations did not involve any medical decision-making at all.

128.    First, the initial examinations did not involve the retrieval, review, and analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Defendants for treatment, they typically did not arrive with any medical records. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor conducted any diagnostic tests.

129.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints.  Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants. In virtually every instance, the Defendants provided a substantially identical treatment plan to the Insureds, consisting of a urine drug screen, pain management services, and referrals for medically unnecessary chiropractic, physical therapy, and acupuncture services, none of which were threatening to an Insured's health or life if properly administered.

130.    Third, the Defendants did not genuinely consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

131.    Rather, to the extent that the initial examinations were conducted in the first instance, the Defendants made a boilerplate, predetermined "diagnosis" for the Insureds, upon which the Defendants directed the Insureds to receive a predetermined pattern of treatment, including a urine drug screen, a recommendation to return to Sood Medical for pain management services and to the providers from which Sood Medical leased office space from for medically unnecessary chiropractic, physical therapy, and acupuncture services.

132.    In keeping with the fact that the initial examination were part and parcel of a predetermined fraudulent treatment protocol, numerous initial examination reports contained the

following verbatim language regarding medically unnecessary drug screens, including the same idiosyncratic grammar and misspellings:

> "The patient had been counseled and had signed a narcotic contract on initial registration with the practic [sic], this contract also indicated point of care screening tests as part of an opiod management program. It was explained to the patient that this screen was necessary to confirm the medications eported [sic] by the patient as being present and also to confirm that the patient reported all medications being taken and to rule out suspected illicit substances. It was also explained to the patient that the results of the point of care screen will factor into decision-making on evolving a plan of care and future management of the patient. The patient was also advised that due to the limitations a [sic] qualitative testing, further confirmation testing may be warranted for synthetic and semisynthetic opioids. The patient was also advised that any unreported medication being taken would be identified and appropriate counselling would be given to the patient in order to prevent harmful interactions and/or potential overdose. Initial urine screening would be collected and performed in our office for preliminary reading, which will be documents in the patient's chart. The speciman [sic] will then be sent to the labratory [sic] for confirmatory results."

133.    In keeping with the rote, predetermined, fraudulent nature of the examination reports submitted through Sood Medical, the Defendants indicated that numerous patients had signed a narcotic contract, including an eleven-year-old boy purportedly injured in a 2019 motor vehicle accident.

134.    In fact, to the extent that the initial examinations were conducted in the first instance, the Defendants made a boilerplate, predetermined "diagnosis" for the Insureds, upon which the Defendants directed the Insureds to receive a predetermined pattern of treatment, including a urine drug screen, a recommendation to return to Sood Medical for medically unwarranted pain management services and to the providers from which Sood Medical leased office space from for medically unnecessary chiropractic, physical therapy, and acupuncture services.

135.    In the claims for initial examinations under CPT codes 99245, 99244, 99205, or 99204, the Defendants falsely represented that the initial examinations involved medical decision-making of high complexity or moderate complexity in order to provide a false basis to bill for the

initial examinations under CPT codes 99245, 99244, 99205, or 99204, because those CPT codes are reimbursable at a higher rate than examinations that do not require high complexity or moderate complexity medical decision-making.

136.     Furthermore, according to the Fee Schedule, the use of CPT codes 99245 or 99244 requires that the performing physician who performed a consultation at the request of another physician or other appropriate source: (i) document the necessity for the consultation; (ii) include the name of the requesting physician or other referral source on the bill for the consultation; and (iii) report the opinion rendered and services ordered or performed as a result of the consultation to the referring entity.

137.     The initial consultations purportedly provided by the Defendants, however, did not comply with these requirements. Instead, the Defendants – to the extent that they performed the consultations in the first instance – virtually always failed to (i) document the necessity for the consultation; (ii) include the name of the requesting physician or other referral source on the bill for the consultation; and (iii) document and report the opinion rendered and services ordered or performed as a result of the consultation to the referring entity.

138.     The consultation reports and treatment notes submitted by the Defendants for initial consultations using CPT codes 99245 or 99244 virtually always failed to indicate why the consultation was necessary.

139.     Furthermore, the bills submitted by the Defendants for initial consultations using CPT codes 99245 or 99244 virtually always failed to include the name of the requesting physician or other referral source on the bill for the consultation. In fact, though the Defendants' template examination report contained a space for the name of the "Referring Provider", this space was routinely left blank.

140.    The Defendants routinely left the "Referring Provider" space blank so as to conceal the true sources of the referrals for the purported examinations, as well as the identities of the owners/operators of the No-Fault Clinics to whom Sood and Sood Medical paid kickbacks in exchange for access to Insureds, and back to whom the Defendants referred the Insureds for continued medically unnecessary chiropractic, physical therapy, and acupuncture services, pursuant to their illegal kickback and referral scheme.

141.    In addition, the treatment notes submitted by the Defendants for initial consultations using CPT codes 99245 or 99244 virtually always failed to include any indication that Sood and Sood Medical communicated any report to the referring physician regarding the opinion rendered and services ordered or performed as a result of the consultation.

**2.      The Fraudulent Charges for Follow-up Examinations at Sood Medical**

142.    In addition to their fraudulent initial examinations, Sood, Shah, Arora, Liu, and Sood Medical often purported to subject the Insureds in the claims identified in Exhibit "1" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

143.    Sood, Shah, Arora, and Liu purported to perform most of the putative follow-up examinations at the No-Fault Clinics and at ambulatory surgery centers in New York and New Jersey, which were then billed to GEICO through Sood Medical, typically under CPT code 99213, resulting in a charge of $300.00 for each putative follow-up examination.

144.    Like the charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Sood and Sood Medical paid to the Referring Providers at the No-Fault Clinics, not to treat or otherwise benefit the Insureds.

145.    The charges for the follow-up examination also were fraudulent in that they misrepresented Sood Medical's eligibility to receive PIP Benefits in the first instance. In fact, Sood Medical was never eligible to receive PIP Benefits in the first instance, because of the fraudulent and unlawful conduct described herein.

146.    In addition, the charges for the follow-up examinations were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

147.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

148.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination, specifically:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

149.    Accordingly, pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

150.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries virtually always were ordinary soft tissue injuries such as sprains and strains, which were not severe at all.

151.    Ordinary soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

152.    By the time the Insureds in the claims identified in Exhibit "1" to Sood Medical for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

153.    Even so, in the claims for follow-up examinations identified in Exhibit "1", Sood, Shah, Arora, Liu, and Sood Medical routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the purported follow-up examinations.

154.    In the claims for follow-up examinations identified in Exhibit "1", Sood, Shah, Arora, Liu, and Sood Medical routinely falsely represented that the Insureds presented with problems of low to moderate severity or moderate in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT

code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

155.     In the claims for follow-up examinations identified in Exhibit "1", Sood, Shah, Arora, Liu, and Sood Medical also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, as described herein.

156.     Furthermore, and pursuant to the NY Fee Schedule and NJ Fee Schedule, when Sood, Shah, Arora, Liu, and Sood Medical submitted charges for the follow-up examinations under CPT code 99213, they represented that they performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

157.     In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Sood, Shah, Arora, and Liu did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

158.     Rather, following their purported follow-up examinations, Sood, Shah, Arora, and Liu simply reiterated the false, boilerplate "diagnoses" that they provided to the Insureds following their purported initial examinations, and recommended that the Insureds continue to return to Sood Medical for additional medically unnecessary Fraudulent Services.

159.     In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary Fraudulent Services by the Defendants, Sood, Shah, Arora, Liu, and Sood Medical routinely falsely reported that the

Insureds continued to suffer from the effects of soft tissue injuries secondary to minor automobile accidents, long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

160.   In further keeping with the fact that the Defendants did not conduct any "comprehensive" physical examinations, the follow-up examination reports contained the same verbatim language found in the initial examination reports that was copied-and-pasted across numerous reports for numerous different Insureds.

161.   For example, numerous follow-up examination reports contained the following language:

> "I am recommending that the patient commence/continue with a rehabilitation program, three times a week for four weeks, to facilitate maximal benefit in conjunction with interventional pain management. This program is recommend to address function limits, decrease pain, increase range of motion, increase strengthening [sic] and correct biomechanics of the spine. By achieving pain reduction, this program is directed to decrease muscle spasm, increase range of motions, facilitate and train weak muscles, accelerate the healing process thereby restoring normal patterns of muscle function, increase capacity to function and perform ADL's and work tasks. The patient's treatment should include acupuncture, therapeutic activities and exercises, neuromuscular re-education etc. I believe that a combination of proposed pain management protocols / medications / intervention and a course of physical therapy / rehabilitation including but not limited to acupuncture is medically necessary and will significantly impact and facilitate this patients [sic] recovery."

162.   In the claims for follow-up examinations identified in Exhibit "1", Sood, Shah, Arora, Liu, and Sood Medical routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

### 3.     The Fraudulent Charges for Drug Screens

163.     In order to maximize the amount of fraudulent billing that the Defendants could submit to GEICO and other insurers, the Defendants purported to subject virtually all of the Insureds in the claims identified in Exhibit "1" to fraudulent and medically unnecessary urine drug tests, involving testing for specific levels of a laundry-list of dozens of substances, with no justification or clinical indication for testing of that specificity or scope.

164.     In a legitimate clinical setting, testing of urine for drugs of abuse is performed to determine compliance with drug rehabilitation programs, to detect drug abuse in asymptomatic patients, or to determine compliance with pain management treatment.

165.     The standard of care for urine drug testing first involves the performance of an initial qualitative test – also known as a "screen" – which defines the result as "positive" or "negative", indicating the presence or absence of a drug above the detection threshold of the test.

166.     A qualitative test, in other words, determines whether the drug is present in a test specimen, not how much of the drug is present.

167.     The purpose of performing qualitative urine drug screens is to determine quickly and reasonably accurately whether any one of several drugs and/or types of drugs is present in the specimen.

168.     Qualitative urine drug screens are performed to separate unexpected results, which may require additional confirmation or quantitative testing, from expected results, which generally do not require any further testing.

169.     In other words, a qualitative test indicating the presence of a drug that is contained in a medication prescribed to the patient is an expected result, which generally would not require further testing. Similarly, a qualitative test indicating the absence of illicit drugs or drugs not

contained in medication prescribed to the patient is also an expected result, which generally would not require further testing.

170.    If a qualitative test indicates the presence of a drug, a more targeted quantitative test can be used to then determine the amount of that specific drug in the specimen.

171.    In contrast to qualitative drug testing results – which produces a value of "positive or negative" with respect to a specific drug – quantitative drug testing produces a precise numeric value representing the amount of a specific drug in the specimen using a more complex – and expensive – testing method than qualitative testing.

172.    In a legitimate clinical setting, for pain management patients, and in the absence of suspected drug abuse or illicit drug use, quantitative testing of illicit drugs or prescription medication is not medically necessary.

173.    For example, absent the finding of a non-prescribed or illicit substance detected during an initial legitimate qualitative urine drug test (i.e., a "positive" result for an unexpected substance), quantitative testing for multiple drugs is not medically necessary.

174.    Accordingly, the routine performance of quantitative drug testing for a predetermined list of drugs is inconsistent with the standard of care and not medically necessary.

175.    Pursuant to their predetermined fraudulent treatment and billing protocol, the Defendants performed medically unnecessary drug testing on virtually every Insured in Exhibit "1" by collecting a urine sample from the Insureds during the initial examinations.

176.    Pursuant to their predetermined fraudulent treatment and billing protocol, Sood and Sood Medical then simultaneously purported to perform: (i) qualitive urine drug tests for several classes of drugs; and (ii) quantitative urine drug testing for a massive laundry list of drugs, without

waiting for the results of the qualitative tests or the existence of any medical or clinical justification for quantitative testing.

177.    Sood and Sood Medical billed the urine drug tests through the Sood Medical to GEICO using multiple units of CPT codes 80100, 80101, 80102, 80104, 80152, 80154, 80160, 80174, 80182, 80184, 80299, 80305, 80307, 80321, 80322, 80323, 80324, 80332, 80333, 8033, 80337, 80338, 80345, 80346, 80348, 80349, 80353, 80354, 80355, 80356, 80357, 80358, 80359, 80360, 80361, 80362, 80363 , 8036, 80366, 80368, 80369, 80370 , 80371, 80372, 80373, 82055, 82205, 82520, 82541, 82542, 82646, 82649, 83788, 83789, 83805, 83840, 83887, 83992, G0477, G0481 and G0483, resulting in combined charges in excess of $1,300.00 for virtually every Insured.

178.    Through the use of CPT codes 80152, 80154, 80160, 80174, 80182, 80184, 80299, 80305, 80307, 80321, 80322, 80323, 80324, 80332, 80333, 8033, 80337, 80338, 80345, 80346, 80348, 80349, 80353, 80354, 80355, 80356, 80357, 80358, 80359, 80360, 80361, 80362, 80363 , 8036, 80366, 80368, 80369, 80370 , 80371, 80372, 80373, 82055, 82205, 82520, 82541, 82542, 82646, 82649, 83788, 83789, 83805, 83840, 83887, 83992, G0477, G0481 and G0483, Sood and Sood Medical represented that they performed quantitative urine drug testing for each of the drugs in every urine drug test without waiting for a positive result on a qualitative test or any other medical justification.

179.    Sood Medical purportedly performed quantitative testing to determine the precise amount of any specific substance or substances, rather than first performing legitimate qualitative testing.

180.    Accordingly, the urine drug tests in the claims identified in Exhibit "1" were not consistent with the standard of care, and not medically necessary, because Sood and Sood Medical

purported to perform quantitative urine drug testing simultaneously with or without first performing any legitimate initial qualitative urine drug screen.

181.    Sood and Sood Medical performed quantitative urine drug testing on every Insureds' urine specimens because they would be able to charge GEICO more for quantitative testing than if they had first performed legitimate qualitative urine drug tests and then performed quantitative urine drug tests as needed.

182.    For example, Sood and Sood Medical billed GEICO for more than $1,300.00 in fraudulent, medically unnecessary urine drug screens for the following Insureds:

(i)      EA

(ii)     MA

(iii)    SB

(iv)     AB

(v)      NB

(vi)     TB

(vii)    MC

(viii)   GC

(ix)     SC

(x)      RD

(xi)     DD

(xii)    BD

(xiii)   SF

(xiv)    AF

(xv)     NG

(xvi)    GG

(xvii)   JG

(xviii) WG

(xix) CH

(xx) RH

(xxi) AJ

(xxii) CJ

(xxiii) SK

(xxiv) AM

(xxv) BM

183.    These are only representative examples. In the claims for urine drug screens identified in Exhibit "1", Sood and Sood Medical routinely falsely represented that the urine drugs screens were medically necessary or part of Insureds' legitimate treatment.

184.    The Defendants utilized a fraudulent and predetermined protocol to perform quantitative urine drug testing on every Insureds' urine specimens, which was not consistent with the standard of care, not medically necessary, and not performed for the benefit of their patients; rather, their fraudulent and predetermined protocol was designed solely to maximize the billing that they could submit to GEICO.

185.    In keeping with the fact that the urine drug tests in the claims identified in Exhibits "1" were not consistent with the standard of care and were not medically necessary, Sood and Sood Medical purported to perform quantitative urine drug testing on every Insureds' urine specimens to test for virtually the same combination of drugs in virtually every urine drug test, regardless of any Insured's individual circumstances or risk profile for abuse.

186.    In virtually every initial examination in the claims identified in Exhibits "1", the examination reports do not state that the Defendants had made any determination as to whether to prescribe any narcotic medication or controlled substance to the Insureds, whether the patient

requested a prescription for any narcotic medication or controlled substance, or whether the patient was at risk for abuse of any such substances – yet drug testing was performed systematically on every Insureds' urine specimens, which was oftentimes collected before the purported examination was performed.

187.    The Defendants systematically subjected Insureds to multiple, medically unnecessary urine drug tests regardless of whether there was any evidence that the Insureds were abusing a narcotic medication or controlled substance, not properly taking any prescribed medication, or had risk factors for abuse.

188.    Furthermore, Sood Medical and Sood virtually always subjected Insureds to urine drug screens at their very first visit, before the examining physician had decided to prescribe any medications.

189.    The putative urine drug tests also played no legitimate role in the Defendants' decision-making relating to the medications they prescribed to the Insureds.

190.    For example, the results of the purported urine drug tests—though purportedly obtained on the same day of the initial examination in most instances—were virtually never documented in the initial examination reports or any follow-up examination reports, even in the case of positive results.

191.    Accordingly, the urine drug tests purportedly performed by the Defendants, and billed to GEICO, were fraudulent, medically unnecessary, and played no legitimate role whatsoever in the treatment of the Insureds.

192.    Each of the charges submitted by Sood and Sood Medical for the urine drug tests falsely represented that the screens were medically necessary, when in fact they were not.

**4.    The Fraudulent Charges for Pain Management Injections**

193.    As part and parcel of the Defendants' fraudulent scheme, Sood, Shah, Arora, or Liu, and Sood Medical caused most of the Insureds in the claims identified in Exhibit "1" to be subjected to a series of medically unnecessary pain management injections including, but not limited to, epidurograms, epidural injections, facet injections, transforaminal injections, and arthrocentesis injections, which often purportedly were performed with fluoroscopic guidance and under anesthesia.

194.    Typically, Sood, Shah, Arora, or Liu purported to perform the injections, and either Sood, Shah, Arora, or Liu purported to provide the anesthesia services.

195.    As set forth in Exhibit "1", Sood, Shah, Arora, and Liu then: (i) billed the injections through Sood Medical to GEICO, typically under CPT codes 62310, 62311, 62321, 62323, 64490, 64491, 64492, 64493, 64494, 64495, 72275, and 76942; and (ii) billed the concomitant anesthesia services through Mid-State Anesthesia to GEICO, typically under CPT code 01992.

196.    As set forth below, the charges for the pain management injections, concomitant anesthesia services, and facility fees were fraudulent because the pain management injections and anesthesia services were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

197.    Furthermore, and as set forth below, the Defendants' charges for the pain management injections and the related anesthesia services and facility fees also were fraudulent because they were the product of illegal self-referrals.

198.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

199.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

200.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

201.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

202.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

203.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

204.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

205.    However, in the claims for pain management injections identified in Exhibit "1",

Sood Medical, Sood, Shah, Arora, or Liu:

(i)     routinely referred the Insureds for pain management injections before the Insureds had tried and failed any course of legitimate, conservative treatment; and/or

(ii)    routinely purported to administer multiple pain management injections to Insureds within a span of weeks, despite the fact that such a regimen not only was medically unnecessary, but also placed the Insureds at risk.

206.    For example:

(i)     On April 16, 2017, an Insured named JS was involved in an automobile accident. Thereafter, on July 8, 2017, Sood Medical and Sood purported to provide an intralaminar injection to JS. Barely a month later, on August 12, 2017, Sood Medical and Shah purported to provide multiple facet injections to JS. Less than a month after that, on September 9, 2017, Sood Medical and Sood purported to provide an intralaminar injection to JS. Less than a month after that, on November 4, 2017, Sood Medical and Sood purported to provide multiple facet injections to JS. Less than six weeks after that, Sood Medical and Sood purported to provide multiple facet injections.

(ii)    On August 2, 2017, an Insured named DM was involved in an automobile accident. Thereafter, on March 30, 2018, Sood Medical and Shah purported to provide an intralaminar injection to DM. Three weeks later, on April 20, 2018, Sood Medical and Shah purported to provide multiple facets injections to DM. Another three weeks later, on May 11, 2018, Sood Medical and Shah purported to provide an intralaminar injection to DM. Two weeks later, on May 25, 2018, Sood Medical and Shah purported to provide another intralaminar injection to DM. Another two weeks later, on June 8, 2018, Sood Medical and Arora provided multiple facet injections to DM.

(iii)   On March 27, 2017, an Insured named BA was involved in an automobile accident. Thereafter, on May 26, 2017, Sood Medical and Shah purported to provide multiple intralaminar injections to BA. Only two weeks later, on June 9, 2017, Sood Medical and Shah purported to provide multiple intralaminar injections to BA. Three weeks later, on June 30, 2017, Sood Medical and Shah purported to provide multiple intralaminar injections to BA. Less than two months later, on August 25, 2017, Sood Medical and Shah purported to provide multiple intralaminar injections.

(iv)    On March 29, 2018, an Insured named HM was involved in an automobile accident. Thereafter, on June 15, 2018, Sood Medical and Arora purported to provide an intralaminar injection to HM. Only two weeks later, on June

29, 2018, Sood Medical and Arora purported to provide multiple facet injections to HM. Less than two months later, Sood Medical and Auror purported to provide an intralaminar injection to HM.

(v)     On December 30, 2016, an Insured named GA was involved in an automobile accident. Thereafter, on April 14, 2017, Sood Medical and Shah purported to provide multiple intralaminar injection to GA. Only two weeks later, on April 28, 2017, Sood Medical and Shah purported to provide multiple facet injections to GA.

(vi)    On September 14, 2018, an Insured named ER was involved in an automobile accident. Thereafter, on November 8, Sood Medical and Shah purported to provide an intralaminar injection to ER. Barely a month later, on December 11, 2018, Sood Medical and Shah purported to provide multiple facet injections to ER. Barely a month later, on January 14, 2019, Sood Medical and Shah purported to provide multiple facet injections to ER. Only two weeks later, on January 29, 2019, Sood Medical and Shah purported to provide an intralaminar injection to ER.

(vii)   On February 7, 2017, an Insured named BG was involved in an automobile accident. Thereafter, on June 2, 2017, Sood Medical and Shah purported to provide multiple intralaminar injections to BG. Only two weeks later, on June 16, 2017, Sood Medical and Shah purported to provide multiple facet injections to BG. Only two weeks later, on June 30, 2017, Sood Medical and Shah purported to provide an intralaminar injection to BG.

(viii)  On May 9, 2018, an Insured named AJ was involved in a motor vehicle accident. Thereafter on July 30, 2018, Sood Medical and Sood purported to provide AJ with an intralaminar injection. Only two weeks later, on August 13, 2018, Sood Medical and Sood purported to provide AJ with an intralaminar injection. Less than a month later, on September 10, 2018, Sood Medical and Sood purported to provide AJ with multiple facet injections. Less than two months later, on November 3, 2018, Sood Medical and Sood purported to provide AJ with an intralaminar injection.

(ix)    On September 28, 2019, an Insured named EL was involved in a motor vehicle accident. Thereafter on December 12, 2019, Sood Medical and Liu purported to provide EL with an intralaminar injection. Less than a month later, on January 9, 2020, Sood Medical and Liu purported to provide multiple facet injections too EL.

(x)     On October 16, 2019, an Insured named BN was involved in a motor vehicle accident. Thereafter on December 3, 2019, Sood Medical and Liu purported to provide multiple facet injections to BN. Only two weeks later, on December 16, 2019, Sood Medical and Liu purported to provide multiple facet injections to BN.

207.    Sood Medical, Sood, Shah, Arora, and Liu's predetermined treatment protocol – including subjecting Insureds to a large amount of medically unnecessary pain management injections over the course of a few weeks, before the Insureds had failed any legitimate course of conservative treatment – was designed and employed by Sood Medical, Sood, Shah, Arora, and Liu solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

208.    In keeping in the fact that the pain management injections were provided pursuant to a predetermined protocol designed to maximize the billing that Sood Medical, Sood, Shah, Arora, and Liu could submit to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it, Sood Medical, Sood, Shah, Arora, and Liu provided pain management injections to many Insureds despite the fact that the Insureds had suffered no injuries that legitimately would warrant any pain management injections at all.

209.    As set forth above, virtually all of the Insureds in the claims identified in Exhibit "1" whom the Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

210.    In keeping with the fact that the Insureds' accidents were minor, most of the Insureds in the claims identified in Exhibit "1" did not visit any hospital emergency room following their accidents. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

211.    Furthermore – and again in keeping with the fact that the Insureds' accidents were minor – contemporaneous police reports regarding the claims identified in Exhibit "1" frequently

indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

212.     Virtually none of the Insureds in the claims identified in Exhibit "1" suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

213.     To the extent that the Insureds in the claims identified in Exhibit "1" suffered from any injuries or health problems at all as the result of their minor accidents, the injuries virtually always were minor, garden-variety strains and sprains.

214.     As set forth above, ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

215.     Concomitantly, virtually none of the Insureds in the claims identified in Exhibit "1" required extensive pain management treatment, especially invasive pain management injections provided months or even more than a year after the underlying accidents.

216.     Even so, in addition to billing for medically unnecessary pain management injections before the Insureds had tried and failed any legitimate course of more conservative treatment, Sood Medical, Sood, Shah, Arora, and Liu also routinely provided medically unnecessary pain management injections to Insureds who had been involved in very minor accidents – and who had not suffered any injury more serious than a sprain or strain – many months or even more than a year after the underlying accidents, long after any legitimate injuries the Insureds had experienced would have resolved.

217.    As set forth above, Sood Medical, Sood, Shah, Arora, and Liu routinely submitted billing to GEICO for medically unnecessary pain management injections, in that the pain management injections: (i) were provided, to the extent that they were provided at all, primarily for the benefit of the Defendants, and not to treat or otherwise benefit the Insureds; and (ii) were not the most appropriate standard of level of service in accordance with standards of good practice and standard professional treatment protocols.

### 5.    Misrepresentations Regarding the Reimbursable Amount for the Pain Management Injections

218.    As set forth above, the No-Fault Laws prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule.

219.    Not only did Sood Medical and Sood routinely bill GEICO for medically unnecessary pain management injections, they also routinely misrepresented the reimbursable amount for the pain management injections.

220.    Specifically, and as set forth above and in Exhibit "1", Sood Medical, Sood, Shah, Arora, and Liu billed virtually all of their purported pain management injections under CPT codes 62310, 62311, 62321, 62323, 64490, 64491, 64492, 64493, 64494, 64495, 72275, and 76942.

221.    The following chart sets forth the maximum reimbursable amount under the Fee Schedule for pain management injections under those CPT codes, as well as the unlawfully inflated charges that Sood Medical and Sood routinely submitted under those codes through Sood Medical to GEICO:

| CPT Code | Procedure Description | Fee Schedule Amount | Sood Medical Billed Amount |
|---|---|---|---|
| 62310 | INJECT SPINE C/T | $1,021.73 | $4,000.00 |
| 62311 | INJECT SPINE L/S (CD) | $879.37 | $4,000.00 |
| 62321 | INJECT SPINE C/T W/O GUIDANCE | $1,021.73 | $6,000.00 |

| 62323 | INJECT SPINE C/T W/ GUIDANCE | $879.37 | $6,000.00 |
|---|---|---|---|
| 64490 | INJECT PARAVERT F JOINT C/T 1 | $724.40 | $6,000.00 - $10,000.00 |
| 64491 | INJECT PARAVERT F JOINT C/T 2 | $362.70 | $4,000.00 - $10,000.00 |
| 64492 | INJECT PARAVERT F JOINT C/T 3 | $366.74 | $6,000.00 - $10,000.00 |
| 64493 | INJECT PARAVERT F JNT L/S 1 LEV | $663.78 | $6,000.00 - $10,000.00 |
| 64494 | INJECT PARAVERT F JNT L/S 2 LEV | $328.80 | $6,000.00 - $10,000.00 |
| 64495 | INJECT PARAVERT F JNT L/S 3 LEV | $333.65 | $6,000.00 - $10,000.00 |
| 72275 | EPIDUROGRAM | $572.81 | $1,000.00 - $2,000.00 |
| 76942 | DIAGNOSTIC ULTRASONIC GUIDANCE | $313.52 | $1,000.00 - $1,500.00 |

For example:

(i)     Sood Medical and Sood sent GEICO a bill for $2,000.00 for a cervical/thoracic injection under CPT code 62310 allegedly provided to an Insured named Oral Howe on August 26, 2016.

(ii)    Sood Medical and Sood sent GEICO a bill for $4,000.00 for a lumbar/sacral injection under CPT code 62311 allegedly provided to an Insured named Vivian Saint-Jean on September 15, 2016.

(iii)   Sood Medical and Sood sent GEICO a bill for $6,000.00 for a cervical/thoracic injection under CPT code 62321 allegedly provided to an Insured named Shawneequa Clark on March 3, 2017.

(iv)    Sood Medical and Sood sent GEICO a bill for $6,000.00 for a cervical/thoracic injection with guidance under CPT code 62323 allegedly provided to an Insured named Fritzgerald Narcisse on March 17, 2018.

(v)     Sood Medical and Sood sent GEICO a bill for $10,000.00 for bilateral cervical/thoracic facet injections under CPT Code 64490 allegedly provided to an Insured named Bakiet Nesheiwatt on December 3, 2019.

(vi)    Sood Medical and Sood sent GEICO a bill for $10,000.00 for bilateral cervical/thoracic facet injections under CPT Code 64491 allegedly provided to an Insured named Leslie Solomon on May 4, 2019.

(vii)   Sood Medical and Sood sent GEICO a bill for $10,000.00 for bilateral cervical/thoracic facet injections under CPT Code 64492 allegedly provided to an Insured named Belarmino Santos on November 15, 2019.

(viii)  Sood Medical and Sood sent GEICO a bill for $10,000.00 for bilateral lumbar/sacral facet injections under CPT Code 64493 allegedly provided to an Insured named Delisia Stewart on September 24, 2019.

(ix)     Sood Medical and Sood sent GEICO a bill for $10,000.00 for bilateral lumbar/sacral facet injections under CPT Code 64494 allegedly provided to an Insured named Ashley Munoz on November 9, 2019.

(x)      Sood Medical and Sood sent GEICO a bill for $10,000.00 for bilateral lumbar/sacral facet injections under CPT Code 64495 allegedly provided to an Insured named Lorraine Bunting on November 7, 2019.

222.     These are only representative examples. As set forth in Exhibit "1", virtually all of Sood Medical's charges for pain management injections were unlawfully inflated.

223.     Each and every one of Sood Medical, Sood, Shah, Arora, and Liu's inflated charges for pain management injections constituted a separate violation of N.J.S.A. § 39:6A-4.6(c).

224.     Sood, Shah, Arora, and Liu knowingly submitted charges through Sood Medical in gross excess of the amounts allowed under the Fee Schedule in order to maximize the amount of fraudulent billing they could submit to GEICO.

**6.      The Medically Unnecessary Anesthesia Services**

225.     In the claims identified in Exhibit "1", the pain management injections purportedly provided by Sood, Shah, Arora, Liu, and Sood Medical were virtually always administered using anesthesia, specifically sedation.

226.     As set forth in Exhibits "2", the anesthesia services typically were billed through the Sood Medical to GEICO under CPT code 01992, resulting in a charge of between $1,920.00 and $2,800.00, for each round of sedation that each Insured purportedly received.

227.     However, in a legitimate clinical setting, pain management injections typically do not require sedation.

228.     Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See Smith,

Howard, M.D., <u>Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures</u>, Pain Physician 2013.

229.     Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, and occipital nerve block and facet joint injections." <u>See</u> American Society of Anesthesiologists, "Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

230.     Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

231.     Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

232.     Even so, in the claims for pain management injections and anesthesia identified in Exhibits "1" and "2", Sood, Shah, Arora, Liu, and Sood Medical routinely purported to provide the Insureds with unjustified, medically unnecessary, and indeed dangerous sedation.

233.     Sood, Shah, Arora, Liu, and Sood Medical were well-aware of the fact that sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

234.     Even so, Sood, Shah, Arora, Liu, and Sood Medical routinely provided sedation to the Insureds in the claims identified in Exhibits "1" and "2" in order to: (i) increase the amount of

fraudulent billing that they could submit to GEICO and other insurers; and (ii) as discussed below, create the false appearance that the anesthesia and interventional pain management services qualified for the ASC Exception to the Codey Law.

235.    Each of the anesthesia services attendant to the pain management injections that are identified in Exhibits "1" and "2" was medically unnecessary, in that the anesthesia services: (i) were provided, to the extent that they were provided at all, primarily for the benefit of the Defendants and not to treat or otherwise benefit the Insureds; and (ii) were not the most appropriate standard of level of service in accordance with standards of good practice and standard professional treatment protocols.

**7.    The Illegal Self-Referrals for Pain Management Injections**

236.    What is more, the charges for the pain management injections were fraudulent in that they misrepresented Sood Medical and Mid-State Anesthesia's entitlement to reimbursement for the pain management injections in the first instance. In fact, Sood Medical and Mid-State Anesthesia were not eligible to receive reimbursement for the injections, not only because they paid kickbacks in exchange for patient referrals, and not only because the injections were medically unnecessary, but because the charges for the pain management injections and concomitant anesthesia fees were the product of unlawful self-referrals.

237.    Sood, Shah, Arora, and Liu – as licensed physicians – are "practitioners" as defined by the Codey Law. See N.J.S.A. 45:9–22.4.

238.    Sood Medical and Mid-State Anesthesia are "healthcare services", in that they are "business entit[ies] which provide on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ." Id.

239.    In the context of the Codey Law, Sood – who owns Sood Medical and Mid-State Anesthesia – has a "significant beneficial interest" in Sood Medical and Mid-State Anesthesia. Id.

240.    As employees receiving renumeration for services provided and billed through Sood Medical and Mid-State Anesthesia, Shah, Arora, and Liu have a "significant beneficial interest" in Sood Medical and Mid-State Anesthesia. Id.

241.    Notwithstanding their respective significant beneficial interests in the Sood Medical and Mid-State Anesthesia, Sood, Shah, Arora, and Liu routinely self-referred – or directed their employees to self-refer – Insureds to the Sood Medical and Mid-State Anesthesia for medically unnecessary pain management injections.

242.    These self-referrals violated the Codey Law, inasmuch as none of the exceptions to the Codey Law applied to these self-referrals.

243.    The exception in the Codey Law, for "medical treatment or a procedure that is provided at the practitioner's medical office", did not apply to the self-referrals for these injections because – as set forth above – virtually all of the pain management injections billed through Sood Medical and Mid-State Anesthesia in the claims identified in Exhibits "1" and "2" purportedly were performed at ambulatory surgery centers, which in most cases were located in New Jersey.

244.    Nor did the ASC Exception apply to these self-referrals, because the pain management injections did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". To the contrary, and as set forth above, all of the anesthesia services attendant to the Sood Medical's pain management injections were medically unnecessary.

245.    What is more, the ASC Exception often did not apply to these self-referrals, because the resulting procedures often were performed by someone other than the practitioner who made the referrals.

246.    For example:

(i)     Sood, Shah, Arora, or Liu caused Insureds to be referred from Spine Care of NJ to Spine Care of NJ for purported pain management injections under

anesthesia provided at a New Jersey ambulatory surgical center, a New Jersey ambulatory surgery center; but

(ii) the practitioner who made the referral did not personally perform the resulting pain management injections under anesthesia.

247. For example:

(i) On March 15, 2017, Shah caused an Insured named Cassandra Aphanord to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Sood, rather than Shah, the practitioner who made the referral.

(ii) On May 31, 2018, Arora caused an Insured named Lucille Alson to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Sood, rather than Arora, the practitioner who made the referral.

(iii) On November 25, 2020, Arora caused an Insured named Mildred McKinney to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Sood, rather than Arora, the practitioner who made the referral.

(iv) On August 15, 2018, Shah caused an Insured named Everton Samuda to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Arora, rather than Shah, the practitioner who made the referral.

(v) On October 12, 2018, Sood caused an Insured named Nicole Gomes to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Shah, rather than Sood, the practitioner who made the referral.

(vi) On March 30, 2018, Shah caused an Insured named Melvin Spann to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the

extent they were performed at all – was performed by Arora, rather than Shah, the practitioner who made the referral.

(vii)    On April 16, 2018, Arora caused an Insured named Malkia Walker to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Shah, rather than Arora, the practitioner who made the referral.

(viii)    On September 25, 2019, Shah caused an Insured named Malkia Walker to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Sood, rather than Shah, the practitioner who made the referral.

(ix)    On May 2, 2018, Shah caused an Insured named Lashon Morris to be referred from Sood Medical to Sood Medical for a pain management injection and an epidurogram to be performed at an ambulatory surgical center. However, the resulting pain management injection and epidurogram – to the extent they were performed at all – was performed by Arora, rather than Shah, the practitioner who made the referral.

(x)    On December 19, 2019, Liu caused an Insured named Lorraine Bunting to be referred from Sood Medical to Sood Medical for multiple pain management injections to be performed at an ambulatory surgical center. However, the resulting pain management injections – to the extent they were performed at all – was performed by Sood, rather than Liu, the practitioner who made the referral.

248.    These are only representative examples of the Defendants' illegal self-referrals for pain management injections. The pain management injections in the claims identified in Exhibits "1" and "2" were routinely the product of illegal self-referrals, inasmuch as none of the referrals qualified for the ASC Exception or any other exception to the Codey Law.

### III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

249.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports

through Sood Medical and Mid-State Anesthesia to GEICO seeking payment for the Fraudulent

Services for which the Defendants were not entitled to receive payment.

250.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by

and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by
and on behalf of Sood Medical and Mid-State Anesthesia uniformly
misrepresented to GEICO that the Fraudulent Services were medically
necessary and, in many cases, misrepresented to GEICO that the Fraudulent
Services actually were performed. In fact, the Fraudulent Services were not
medically necessary, in many cases were not actually performed, and were
performed – to the extent that they were performed at all – pursuant to
predetermined fraudulent protocols designed solely to financially enrich the
Defendants, rather than to treat or otherwise benefit the Insureds who
purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by
and on behalf of Sood Medical and Mid-State Anesthesia uniformly
misrepresented and exaggerated the level of the Fraudulent Services and the
nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by
and on behalf of Sood Medical and Mid-State Anesthesia uniformly
fraudulently concealed the fact that the Fraudulent Services were provided
– to the extent that they were provided at all – pursuant to illegal kickback
and self-referral arrangements amongst the Defendants and others.

(iv)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted
or caused to be submitted by Sood Medical and Mid-State Anesthesia
uniformly misrepresented to GEICO that the Defendants were in
compliance with all significant laws and regulations governing healthcare
practice and/or licensing laws, and therefore were eligible to receive PIP
reimbursement. In fact, as set forth herein, Sood Medical and Mid-State
Anesthesia were not in compliance with all significant laws and regulations
governing healthcare practice and/or licensing laws, and therefore were not
eligible to receive PIP reimbursement.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

251.    The Defendants legally and ethically were obligated to act honestly and with

integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

252.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

253.   Specifically, they knowingly misrepresented and concealed facts related to Sood Medical and Mid-State Anesthesia in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

254.   Additionally, the Defendants entered into financial arrangements with the various Clinics that were designed to, and did, conceal that fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

255.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent predetermined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

256.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

257.   For example, in accordance with the New York no-fault insurance laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending New York claims for PIP Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for PIP Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the

requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

258.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

259.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,300,000.00 based upon the fraudulent charges.

260.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

261.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

262.    There is an actual case and controversy between GEICO and the Provider Defendants regarding more than $16,700,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

263.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided –

to the extent that they were provided at all – pursuant to pre-determined protocols that serve to

financially enrich Defendants, rather than to treat or otherwise benefit the Insureds.

264.    The Provider Defendants have no right to receive payment from GEICO on the

unpaid billing because the billing codes used for the Fraudulent Services misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges

submitted to GEICO.

265.    The Provider Defendants have no right to receive payment from GEICO on the

unpaid billing because the Fraudulent Services were provided – to the extent that they were

provided at all – pursuant to illegal kickback and self-referral arrangements amongst Defendants

and others.

266.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive

payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Sood**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

267.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 259 above..

268.    Sood Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. §

1961(4), that engages in activities that affected interstate commerce.

269.    Sood knowingly has conducted and/or participated, directly or indirectly, in the

conduct of Sood Medical's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous

basis for over two years seeking payments that Sood Medical was not eligible to receive under the New York or New Jersey no-fault insurance law because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

270.    Sood Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sood operated Sood Medical, insofar as Sood Medical is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Sood Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Sood continues to attempt to collect on the fraudulent billing submitted through Sood Medical to the present day.

271.    Sood Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sood Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

272.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Sood Medical.

273.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Sood, Shah, Arora, and Liu
### (Violation of RICO, 18 U.S.C. § 1962(d))

274.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

275.    Sood Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

276.    Sood, Shah, Arora, and Liu knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Sood Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Sood Medical was not entitled to receive under the New York or New Jersey no-fault laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

277.    Sood, Shah, Arora, and Liu knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

278.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Sood Medical.

279.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Sood Medical, Sood, Shah, Arora, and Liu**
**(Common Law Fraud)**

280.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

281.     Sood Medical, Sood, Shah, Arora, and Liu intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

282.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

> (i)     In every claim, the representation that Sood Medical and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Sood Medical and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

> (ii)    In many claims, the representation that the Fraudulent Services were medically necessary, actually performed, and eligible for PIP reimbursement, when in fact they were not.

> (iii)   In every claim for services not performed by Sood, the representation that the billed-for services were performed by Sood Medical employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

283.     Sood Medical, Sood, Shah, Arora, and Liu intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO

to pay charges submitted through Sood Medical that were not compensable under New York and New Jersey no-fault insurance laws.

284. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by Sood Medical, Sood, Shah, Arora, and Liu through Sood Medical.

285. Sood Medical, Sood, Shah, Arora, and Liu's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

286. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
**Against Sood Medical, Sood, Shah, Arora, and Liu**
**(Unjust Enrichment)**

287. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

288. As set forth above, Sood Medical, Sood, Shah, Arora, and Liu engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

289. When GEICO paid the bills and charges submitted by or on behalf of Sood Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Sood Medical, Sood, Shah, Arora, and Liu's improper, unlawful, and/or unjust acts.

290.     Sood Medical, Sood, Shah, Arora, and Liu have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Sood Medical, Sood, Shah, Arora, and Liu voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

291.     Sood Medical, Sood, Shah, Arora, and Liu's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

292.     By reason of the above, Sood Medical, Sood, Shah, Arora, and Liu have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,000,000.00.

**SIXTH CAUSE OF ACTION**
**Against Sood Medical, Sood, Shah, Arora, and Liu**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

293.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above.

294.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Defendants Sood Medical, Sood, Shah, Arora, and Liu knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

> (i)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

> (ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

295.    Sood Medical, Sood, Shah, Arora, and Liu's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## SEVENTH CAUSE OF ACTION
### Against Sood
### (Violation of RICO, 18 U.S.C. § 1962(c))

296.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

297.    Mid-State Anesthesia is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

298.    Sood knowingly has conducted and/or participated, directly or indirectly, in the conduct of Mid-State Anesthesia's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a

continuous basis for over two years seeking payments that Mid-State Anesthesia was not eligible to receive under the New York or New Jersey no-fault insurance law because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

299.    Mid-State Anesthesia's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sood operated Mid-State Anesthesia, insofar as Mid-State Anesthesia is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Mid-State Anesthesia to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Sood continues to attempt to collect on the fraudulent billing submitted through Mid-State Anesthesia to the present day.

300.    Mid-State Anesthesia is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Mid-State Anesthesia in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $269,000.00 pursuant to the fraudulent bills submitted through Mid-State Anesthesia.

302.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<h3 style="text-align:center">EIGHTH CAUSE OF ACTION</h3>

**Against Sood, Shah, Arora, and Liu**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

303.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

304.     Mid-State Anesthesia is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

305.     Sood, Shah, Arora, and Liu knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Mid-State Anesthesia's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Mid-State Anesthesia was not entitled to receive under the New York or New Jersey no-fault laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

306.     Sood, Shah, Arora, and Liu knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

307.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $269,000.00 pursuant to the fraudulent bills submitted through Mid-State Anesthesia.

308.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Mid-State Anesthesia, Sood, Shah, Arora, and Liu**
**(Common Law Fraud)**

309.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

310.    Mid-State Anesthesia, Sood, Shah, Arora, and Liu intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

311.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Mid-State Anesthesia and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Mid-State Anesthesia and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary, actually performed, and eligible for PIP reimbursement, when in fact they were not.

(iii)   In every claim for services not performed by Sood, the representation that the billed-for services were performed by Mid-State Anesthesia employees,

when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

312.    Mid-State Anesthesia, Sood, Shah, Arora, and Liu intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Mid-State Anesthesia that were not compensable under New York and New Jersey no-fault insurance laws.

313.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $269,000.00 pursuant to the fraudulent bills submitted by Mid-State Anesthesia, Sood, Shah, Arora, and Liu through Mid-State Anesthesia.

314.    Mid-State Anesthesia, Sood, Shah, Arora, and Liu's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

315.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Mid-State Anesthesia, Sood, Shah, Arora, and Liu
### (Unjust Enrichment)

316.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above..

317.    As set forth above, Mid-State Anesthesia, Sood, Shah, Arora, and Liu engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

318.   When GEICO paid the bills and charges submitted by or on behalf of Mid-State Anesthesia for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Mid-State Anesthesia, Sood, Shah, Arora, and Liu's improper, unlawful, and/or unjust acts.

319.   Mid-State Anesthesia, Sood, Shah, Arora, and Liu have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Mid-State Anesthesia, Sood, Shah, Arora, and Liu voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

320.   Mid-State Anesthesia, Sood, Shah, Arora, and Liu's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

321.   By reason of the above, Mid-State Anesthesia, Sood, Shah, Arora, and Liu have been unjustly enriched in an amount to be determined at trial, but in no event less than $269,000.00.

**ELEVENTH CAUSE OF ACTION**
**Against Mid-State Anesthesia, Sood, Shah, Arora, and Liu**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

322.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above.

323.   In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Defendants Mid-State Anesthesia, Sood, Shah, Arora, and Liu knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not

medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv)   The NF-3 forms, HCFA-1500 forms, bills, and treatment reports uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

324.    Mid-State Anesthesia, Sood, Shah, Arora, and Liu's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $269,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## **JURY DEMAND**

325.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Sood, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Sood, Shah, Arora, and Liu, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Sood Medical, Sood, Shah, Arora, and Liu, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Sood Medical, Sood, Shah, Arora, and Liu, for more than $1,000,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Sood Medical, Sood, Shah, Arora, and Liu, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

G.    On the Seventh Cause of Action against Sood, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $269,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.    On the Eighth Cause of Action against Sood, Shah, Arora, and Liu, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $269,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.    On the Ninth Cause of Action against Mid-State Anesthesia, Sood, Shah, Arora, and Liu for compensatory damages in an amount to be determined at trial but in excess of $269,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.    On the Tenth Cause of Action against Mid-State Anesthesia, Sood, Shah, Arora, and Liu, for more than $269,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper; and

K.    On the Eleventh Cause of Action against Mid-State Anesthesia, Sood, Shah, Arora, and Liu, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $269,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7.

Dated: Uniondale, New York
       June 29, 2022

                            RIVKIN RADLER LLP

                            By: */s/ Barry I. Levy*
                                Barry I. Levy (BL 2190)
                                Max Gershenoff (MG 4648)
                                Joshua D. Smith (JS 3989)
                          926 RXR Plaza
                        Uniondale, New York 11556
                        (516) 357-3000

                        *Counsel for Plaintiffs, Government Employees*
                        *Insurance Company, GEICO Indemnity*
                        *Company, GEICO General Insurance Company*
                        *and GEICO Casualty Company*

5615773.v9